UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOSE LUIS GONZALEZ and GERARDO
HORTA OCANA,

     Plaintiffs,

v.                                                                Case No:   6:18-cv-1294-Orl-31TBS

AGAVE METAL TRADING LLC and
MANUEL A. KEESEE,

     Defendants.

_____

## AMENDED REPORT AND RECOMMENDATION[1]

     This case comes before the Court on Plaintiffs' Motion for Entry of Default

Judgment (Doc. 21). Defendants have not filed anything in opposition to the motion. For

the reasons that follow, I respectfully recommend that the motion be **granted in part** and

**denied in part**.

### I. Background[2]

     Plaintiff Jose Luis Gonzalez and non-party James Pomeroy were directors of Ma

Niel UK Limited ("Maniel UK") (Doc. 4, ¶ 10).[3]  Defendant Manuel A. Keesee is the vice

---

[1] The undersigned files this Amended Report and Recommendation to correct scrivener's errors in the original Report and Recommendation (Doc. 24), and to address concerns raised in Plaintiff's objections to the original Report and Recommendation (Doc. 26).

[2] The Court has not made any findings of fact in this case. It has simply restated the allegations made in Plaintiffs' complaint (Doc. 4).

[3] Plaintiffs motioned the Court to accept their complaint for filing under seal because the agreement which they allege Defendants breached contains a provision stating that it is confidential (Doc. 1). Plaintiffs do not agree that the agreement should remain confidential (Id., at 2). The Court granted the motion to seal (Doc. 2). Since then, Defendants have not appeared to defend this case and in this Report and Recommendation I find that they breached the agreement. For these reasons, this Report and Recommendation is not being filed under seal, even though it discloses some of the contents of the agreement.

president, secretary, treasurer and managing director of non-party Power Network Group, Inc. ("PNG") (Id., ¶ 13). PNG developed a municipal solid waste gasification power generation system (Id., ¶ 15). In 2017, Maniel UK agreed to underwrite up to $1,300,000 for the development and construction of waste-to-energy plants in the United States and other countries in exchange for PNG's payment of a $50,000 retention fee and a $1,500,000 commitment fee (Id., ¶ 16). Instead of paying the fees, PNG issued a stock certificate to Maniel UK for 500,000 shares of its common stock (Id., ¶ 17).

PNG contracted to buy a building ("Building") in Tampa, Florida from the Bina Kumar Irrevocable Trust ("Kumar") for $9,000,000 (Id., ¶¶ 18-19). As part of this transaction, PNG agreed to give Kumar a $1,000,000 standby letter of credit (Id., ¶¶ 20-21). Despite this agreement, a different entity, Ma Niel Group Mexico Sapi de CV ("Maniel Mexico") delivered its $1,000,000 letter of credit to Kumar (Id., ¶¶ 22-23). Maniel Mexico and Maniel UK are both subsidiaries of Maniel Group S.A. (Id., ¶ 12). Gonzalez and his co-Plaintiff Gerardo Horta Ocana were directors of Maniel Mexico (Id., ¶ 11).

In 2018, Pomeroy decided to sever all ties between Maniel UK, PNG and Keesee (Id., ¶ 24). Keesee also wanted to sever all ties between himself, PNG and Maniel UK (Id., ¶ 25). On March 14, 2018, Keesee sent a letter purporting to rescind Maniel UK's shares in PNG (Id.). The letter, a copy of which was sent to Kumar, also said PNG would buy the Building without Maniel UK (Id., ¶¶ 25-26). Upon learning of this letter, Maniel Mexico purported to revoke the $1,000,000 letter of credit (Id., ¶ 27). Since Maniel Mexico took this action Kumar has unsuccessfully attempted to negotiate the letter of credit (Id., ¶ 28).

In May 2018, Keesee informed Maniel Mexico that in June, PNG would make a $1,000,000 deposit to buy Maniel Mexico's interest in the contract for the Building (Id., ¶

29). In return, PNG asked Maniel Mexico to tell Kumar the letter of credit would not be honored except on instruction from Keesee (Id., ¶ 30). Maniel Mexico agreed to these terms (Id., ¶ 31). PNG failed to pay the $1,000,000 and Kumar has threatened legal action as a result of the revocation of the letter of credit (Id., ¶¶ 33-34). Still, Gonzalez continued his business relationship with Keesee in hopes of salvaging the Building deal and eliminating Maniel Mexico's liability on the letter of credit (Id., ¶ 35).

Keesee is also the controlling person and president of Defendant Agave Metal Trading LLC ("AMT") which is in the business of buying and selling gold (Id., ¶¶ 36, 111). Keesee told Plaintiffs he had been buying and selling gold for over twenty years and that he had all the required licenses and authorizations to purchase and sell gold internationally (Id., ¶ 49).

Beginning in March 2018 Keesee told Gonzalez that Keesee would soon be traveling to Kenya on behalf of AMT to buy unrefined gold, which AMT would bring to the United States where it would be refined, and then transported back to Africa for sale at a significant profit (Id., ¶ 37). Keesee offered Gonzalez the opportunity to invest in this venture (Id.). He also gave Gonzalez correspondence with AMT's gold supplier, evidence of AMT's compliance with international laws regarding the purchase and sale of gold, and his travel visas (Id., ¶ 39). Gonzalez said he and Horta might be interested (Id., ¶ 38).

Keesee initially proposed that Plaintiffs invest $1,500,000 in this venture (Id., ¶ 40). When Plaintiffs declined Keesee told them they could invest the minimum amount of $150,000 so as not to miss out on this excellent investment opportunity (Id., ¶ 41). Keesee also gave Gonzalez a spreadsheet showing that Plaintiffs' $150,000 investment would return a $4,000,000 profit (Id., ¶ 42). At a subsequent meeting, Keesee guaranteed that if Plaintiffs invested $150,000 it would generate a profit of $550,000 of which

$450,000 would be reinvested and used by AMT to purchase additional unrefined gold that would, in 50 days, result in a $4,000,000 profit for Plaintiffs and AMT (Id., ¶ 46). When Keesee made these representations he did not disclose any risks associated with Plaintiffs' proposed investment in AMT (Id., ¶ 51).

In April 2018, Plaintiffs entered into an Investment Agreement with AMT (the "Agreement") (Id., ¶ 52). The Agreement provides for the payment of $100,000 by Gonzalez and $50,000 by Horta to AMT (Id., ¶ 53). It further provides that AMT will acquire unrefined gold for a profit of $4,000,000 over a 50 day period to be shared by Plaintiffs and AMT (Id., ¶ 53). From the profits, Gonzalez was supposed to receive $2,000,000, and Horta was supposed to receive $1,000,000 (Id., ¶ 54). The Agreement does not disclose any risks associated with Plaintiffs' investment with AMT (Id., ¶ 55). Plaintiffs paid AMT the $150,000 on or about April 3, 2018 (Id., ¶ 56).

Plaintiffs allege, on information and belief, that Keesee traveled to Kenya on or about April 3, 2018 to engage in business on behalf of AMT (Id., ¶ 58). Within the first week of Keesee's arrival in Kenya he sent videos and photographs to Gonzalez depicting 50 kilograms of unrefined gold Keesee had purportedly purchased with Plaintiffs' investment funds (Id., ¶ 59). The videos and photographs also showed Keesee in Kenya with cases of large gold bars, cases of small gold nuggets, and Keesee holding bars of gold (Id.).

Approximately two weeks into his trip to Kenya, Keesee sent a verbal message to Gonzalez, stating that everything was going well and that he would be traveling to Dubai the following Monday instead of returning to the United States, as he had originally advised Plaintiffs, to refine 100 kilograms of gold; that he would obtain an additional 200 kilograms of unrefined gold; and then return to the United States in time to finalize the

transaction and pay Plaintiffs prior to the deadline in the Agreement (Id., ¶ 60).

On or about May 7, 2018, Keesee sent Gonzalez an email stating that a second purchase of gold would be leaving Kenya that night to be refined in Dubai (Id., ¶61). Keesee also sent Gonzalez import and export documents dated May 7, 2018 and a shipping tracking record from Emirates SkyCargo, purportedly showing that the gold would be shipped from Kenya to Dubai on May 8, 2018 (Id.).

About May 14, 2018, Keesee sent Gonzalez an email advising that the authorities had confiscated 4.33 kilograms of gold that had already been boarded on a plane; that Keesee had two packages being held in customs in Kenya; and that there would be a court hearing the following day to determine that the gold was not stolen and could be exported to Dubai (Id., ¶ 65).

AMT failed to pay Plaintiffs the guaranteed profits on their investment as required by the Agreement (Id., ¶ 66). On or about May 23, 2018, Keesee sent Gonzalez a proposed Addendum to the Agreement, signed by Keesee, which provided for an extension of time for AMT to pay Plaintiffs their share of the profits from their investment (Id., ¶ 67). Plaintiffs did not agree to and did not sign the Addendum (Id., ¶ 68).

On or about May 24, 2018, Keesee executed and delivered to Plaintiffs a Promissory Note (the "Note") in the principal amount of $150,000, bearing interest at the rate of 5% per annum, with a maturity date of June 15, 2018 (Id., ¶ 69).

In June, 2018, Keesee contacted Gonzalez to request that Plaintiffs immediately send him $6,000 to pay airplane expenses required for the unrefined gold to be shipped from Kenya to Dubai (Id., ¶ 70). Plaintiffs, fearing that if they did not comply they would lose their entire investment, immediately wired $6,000 to AMT's bank account (Id.).

On June 19, 2018, Keesee sent Gonzalez an email stating that he was in Dubai for

the last trip that would allow sufficient gold refinement for him to return to the United States and pay Plaintiffs their profits (Id., ¶ 71). Keesee said this delay was caused in part by problems he had encountered with the United Nations, which required a shipment of 32 kilograms of gold to be returned to Kenya until AMT paid a fine, which was ultimately paid by AMT's attorney in Kenya (Id.). Keesee also told Gonzalez that AMT would earn a profit of only $500,000, which would be deposited directly into AMT's American Chase bank account, from which Keesee would transfer to Plaintiffs their share of the profits (Id., ¶ 72).

On June 25, 2018, Keesee sent Gonzalez an email stating that the sale of the refined gold had been completed; that the sales proceeds had been deposited into AMT's bank account; that a large check would be deposited the following day; and that Keesee planned to leave Dubai on June 26, 2018 (Id., ¶ 73).

On July 7, 2018, Keesee still had not left Dubai; he told Gonzalez he was waiting on payment from the gold purchaser; and that AMT would be responsible for paying a five percent (5%) tax since the company was not registered to do business in the United Emirates (Id., ¶ 74). This was contrary Keesee's prior representations that AMT had all the requisite licenses and authorizations to conduct business in Africa (Id.).

From July 4, 2018 through July 12, 2018, Keesee sent several emails to Gonzalez stating that while in Dubai, a gold purchaser had deposited $234,742.76 into AMT's bank account, from which Plaintiffs would receive $150,000, but that due to numerous problems with the bank Keesee could not transfer the funds to Plaintiffs (Id., ¶ 75). Keesee said he would transfer the money to Plaintiffs immediately once the funds cleared AMT's bank account (Id.).

All communications between Keesee and Gonzalez ceased as of July 23, 2018

and Plaintiffs have not received any payments from AMT or Keesee (Id., ¶ 79). Now, Plaintiffs are suing AMT and Keesee for fraud; breach of the Agreement; violations of sections 10(b) and 20 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5 ("Rule 10b-5"); FLA. STAT. § 517.301; unjust enrichment; and on the Note (Doc. 1).

Plaintiffs do not claim that Keesee's representations concerning AMT or their investment in AMT were false. To the contrary, Plaintiffs allege, on information and belief, that "AMT has earned significant profits from its purchase and sale of gold in Africa and continues to utilize the profits derived from Plaintiffs' Investment Amount (as well as Plaintiffs' names and passport information) to continue buying and selling gold without paying Plaintiffs any profits derived from their Investment Account" (Id., ¶ 82), And, "[u]pon information and belief, Keesee, individually and on behalf of AMT, intended to deprive Plaintiffs of their share of the profits that were derived from Plaintiffs' Investment Amount and retain 100% of the profits for himself and/or AMT …" (Id., ¶ 64). What Plaintiffs complain about is that Keesee and AMT failed to disclose any of the risks associated with their investment in AMT, and Keesee made misrepresentations to them "so that Defendants could purchase and sell gold and retain one hundred (100%) of the profits for themselves" (Id., ¶¶ 51, 55, 87, 98, 101).

AMT and Keesee were served on September 11, 2018 after which Keesee filed a motion to continue/extension of time to respond on behalf of himself and AMT (Doc. 16). The Court denied the motion because Keesee failed to confer with Plaintiffs' counsel in violation of Local Rule 3.01(g), and because AMT can only appear and be heard through an attorney who is a member of the bar of this Court (Doc. 17). Defendants did not renew the motion or otherwise respond to the complaint and the Clerk granted Plaintiffs' motions

for entry of default against both of them (Doc. 19; Doc. 20). Now, Plaintiffs seek the entry of final default judgment.

## II. Discussion

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." FED. R. CIV. P. 55(a). However, a defendant's default alone does not require the court to enter a default judgment. DIRECTV, Inc. v. Trawick, 359 F. Supp. 2d 1204, 1206 (M.D. Ala. 2005). Before judgment is entered pursuant to FED. R. CIV. P. 55(b), there must be a sufficient basis in the pleadings to support the relief sought. Id.

A district court may enter a default judgment against a properly served defendant who fails to defend or otherwise appear if the factual allegations of the complaint, which are assumed to be true, provide a sufficient legal basis for entry of a default judgment. Nishimatsu Constr. Co. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975).[4] In defaulting, a defendant "admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established." Id. "The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law. In short ... a default is not treated as an absolute confession of the defendant of his liability and of the plaintiff's right to recover." Id.

If the facts in the complaint are sufficient to establish liability, then the court must conduct an inquiry to ascertain the amount of damages. See Adolph Coors Co. v.

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

Movement Against Racism & the Klan, 777 F.2d 1538, 1543-44 (11th Cir. 1985). "Damages may be awarded only if the record adequately reflects the basis for the award via a hearing or a demonstration of detailed affidavits establishing the necessary facts." See id. at 1544 (quoting United Artists Corp. v. Freeman, 605 F.2d 854 (5th Cir. 1979) (per curiam)).

A.  Appropriateness of the Entry of Default

1.  *Manuel A. Keesee*

Keesee was served on August 18, 2018 by serving his 30-year old sister/co-resident, Maria Keesee, at their home, located at 5017 Pelleport Avenue, Belle Isle, FL 32812 (Doc. 14). This is good service under FED. R. CIV. P. Rule 4(e). After he was served, Keesee had through September 8, 2018 to respond to Plaintiffs' summons and complaint. See FED. R. CIV. P. 12(a)(1)(A)(i) ("A defendant must serve an answer within 21 days after being served with the summons and complaint[.]"). After Keesee's motion to continue was denied he failed to respond to the complaint or otherwise appear in this case and the time to do so has passed. Accordingly, the Clerk's default was properly entered against him.

2.  *AMT*

AMT was served by serving a summons and copy of the complaint on "Maria R.," as Authorized Representative of AMT at the location listed as the principal address for both AMT and its registered agent, Keesee: 555 Winderley Place, Suite 300, Maitland, FL 32751 on August 17, 2018 (Doc. 13 at 1).[5]  A plaintiff may serve a corporate defendant by,

---

[5]
http://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionT

> [D]elivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and–if the agent is one authorized by statute and the statute so requires–by also mailing a copy of each to the defendant[.]

FED. R. CIV. P. 4(h)(1)(B). A corporate defendant can also be served by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made[.]" FED. R. CIV. P. 4(h)(1)(A), 4(e)(1). Florida law permits process to be served on a limited liability company by serving its registered agent or any employee of the registered agent. FLA. STAT. § 48.062(1). If the limited liability company does not have a registered agent or if the "registered agent cannot with reasonable diligence be served," process may be served on (a) "a member of a member-managed [LLC]"; (b) "a manager of a manager-managed limited liability company"; or (c) "[i]f a member is not available during regular business hours to accept service on behalf of the [LLC], he, she, or it may designate an employee of the [LLC] to accept such service. After one attempt to serve a member, manager, or designated employee has been made, process may be served on the person in charge of the [LLC] during regular business hours." FLA. STAT. § 48.062 (2)(a)-(c). Lastly, the statute provides that "[i]f, after reasonable diligence, service of process cannot be completed under subsection (1) or subsection (2), service of process may be effected by service upon the Secretary of State as agent of the [LLC]" FLA. STAT. § 48.062 (3).

---

ype=Initial&searchNameOrder=AGAVEMETALTRADING%20L160000139690&aggregateId=flal-l16000013969-98dbfe05-ff6f-477e-9a9e-50a28e9467f0&searchTerm=AGAVE%20METAL%20TRADING%20LLC%20&listNameOrder=AGAVEMETALTRADING%20L160000139690

Service of process on AMT satisfied the requirements of FLA. STAT. § 48.062(2). Once it was served, AMT had through September 8, 2018 to respond. See FED. R. CIV. P. 12(a)(1)(A)(i) ("A defendant must serve an answer within 21 days after being served with the summons and complaint[.]"). No attorney has made an appearance (or filed an appropriate response) on behalf of AMT and the time within to do so has passed. Thus, default was properly entered against AMT.

B. Servicemembers Civil Relief Act

The Servicemembers Civil Relief Act ("SCRA") does not bar entry of default judgment against Keesee. The affidavit of attorney Kristen Lake Cardoso confirms that Keesee "is not in the military service of the United States of America," as defined in 10 U.S.C. § 101(a)(4) (Doc. 23 at 3, ¶ 3). Keesee's nonmilitary status is further confirmed by the copy of the Department of Defense's Status Reports filed by Plaintiffs (Doc. 23-1). This is sufficient to satisfy the SCRA's affidavit requirement. See Branch Banking and Trust Co. v. Chalifoux Bus. Park, LLC, Case No. 6:15-cv-2005-Orl-31TBS, 2016 WL 1238746, at *2 (M.D. Fla. Mar. 10, 2016); see also 50 U.S.C. § 3931.

C. Entry of Default Judgment

1. *Fraud in the Inducement*

Plaintiffs allege that Defendants made false statements of material fact by failing to disclose any risks associated with their investment in AMT (Id., ¶¶ 86-91). To sustain a claim for fraud, a plaintiff must allege: "(1) a false statement of [material] fact; (2) known by the defendant to be false at the time it was made; (3) made for the purpose of inducing the plaintiff to act in reliance thereon; (4) action by the plaintiff in reliance on the correctness of the representation; and (5) resulting damage or injury ... In addition, plaintiff's reliance on the representation must be reasonable." Jaffe v. Bank of America,

N.A., 667 F. Supp. 2d 1299, 1321 (S.D. Fla. 2009); see Linville v. Ginn Real Estate Co.

LLC, 697 F. Supp. 2d 1302, 1308 (M.D. Fla. 2010); Int'l Star Registry v. Omnipoint Mkg.,

LLC, 510 F. Supp. 2d 1015, 1024 (S.D. Fla. 2007); Dunkel v. Hamilton, No. 3:15-cv-949-

J-34PDB, 2016 WL 4844662, at * 11 (M.D. Fla. Aug. 8, 2016) (citing Samuels v. King

Motor Co. of Fort Lauderdale, 782 So. 2d 489, 497 (Fla. Dist. Ct. App. 2001)).

    A pleading that contains allegations of fraud is subject to the heightened pleading

standard in FED. R. CIV. P. 9(b):

> In alleging fraud or mistake, a party must state with
> particularity the circumstances constituting fraud or mistake.
> Malice, intent, knowledge, and other conditions of a person's
> mind may be alleged generally.

Id. Generally, Rule 9(b) may be satisfied if the complaint sets forth:

> (1) [P]recisely what statements were made in what documents
> or oral representations or what omissions were made, and

> (2) [T]he time and place of each such statement and the
> person responsible for making (or, in the case of omissions,
> not making) the same, and

> (3) [T]he content of such statements and the manner in which
> they misled the plaintiff, and

> (4) [W]hat the defendants obtained as a consequence of the
> fraud.

Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir. 1997).

    Plaintiffs aver that "[a]t the time that Defendants omitted these material facts, they

knew their representations were false as a result of the foregoing omissions." (Id., ¶ 88).

However, Plaintiffs have not alleged what material facts Defendants failed to disclose.

Perhaps Plaintiffs are claiming that Defendants should have told them that Defendants

did not intend to return Plaintiffs' investment or deliver Plaintiffs' share of the profits. If so,

then their claim is based on conclusory allegations: "Upon information and belief, Keesee,

individually and on behalf of AMT, intended to deprive Plaintiffs of their share of the

profits that were derived from Plaintiffs' Investment Amount and retain 100% of the profits

for himself and/or AMT once PNG's communications with Kumar regarding the Purchase

Agreement began to deteriorate (if not before that time)." (Id., ¶ 64). And, "[u]pon

information and belief, at the time that he made the foregoing representations to

Gonzalez (on behalf of Plaintiffs), Keesee had no intention of paying Plaintiffs any profits

that were generated as a result of their proposed investment and, in fact, intended to

retain one hundred (100) percent of the profits from Plaintiff's investment for himself

and/or AMT." (Id., ¶ 81). Alleging fraud based upon information and belief is problematic:

> Rule 9(b) of the Federal Rules of Civil Procedure requires that:
> "In all averments of fraud or mistake, the circumstances
> constituting fraud or mistake shall be stated with particularity."
> This requirement of particularity, however, must be read in
> harmony with Rule 8's directive that a plaintiff's claims be
> "short and plain." In the usual case, to pass muster under rule
> 9(b), the complaint must allege the time, place, speaker, and
> sometimes even the content of the alleged misrepresentation.
> Thus, pleadings generally cannot be based on information and
> belief. Where, however, this factual information is peculiarly
> within the defendant's knowledge or control, rule 9(b)'s
> requirement is relaxed somewhat. In such a case, pleading on
> information and belief is acceptable, but on one condition: the
> complaint must adduce specific facts supporting a strong
> inference of fraud or it will not satisfy even a relaxed pleading
> standard. Even under a nonrestrictive application of the rule,
> pleaders must allege that the necessary information lies within
> the defendant's control, and then allegations must be
> accompanied by a statement of facts upon which the
> allegations are based. These facts must amount to more than
> the mere suspicion that a fraud may have occurred. Bald or
> otherwise conclusory allegations will not suffice. The
> supporting facts on which the belief is founded must be set
> forth in the complaint. And the complainant must be able to
> connect the allegations of fraud to the defendant.

United States ex rel. Stinson v. Blue Cross Blue Shield of Ga., Inc., No. CV 489-224, 755

F. Supp. 1040, 1051-52 (S.D. Ga. Oct. 18, 1990) (internal citations and quotations

omitted).

Plaintiffs' complaint fails to pinpoint *exactly* what went wrong in their business relationship with Defendants. Did Keesee make fraudulent representations to induce Plaintiffs to invest; did the fraud occur only after the investments were made: or this is a simple breach of contract? Plaintiffs don't know why they have not received any payments from Defendants. They also have not produced evidence showing that Keesee never intended to give them their share of the profits. Consequently, Plaintiffs have failed to adequately plead supporting facts on which their claims made "on information and belief" are founded and they have not satisfied the Rule 9(b) pleading standard. Great Florida Bank v. Countrywide Home Loans, Inc., No. 10-22124-CIV, 2011 WL 382588, at *5 (S.D. Fla. Feb. 3, 2011); In re Baycol Prod. Litig., 732 F.3d 869, 881-82 (8th Cir. 2013) ("[T]he fraud in the inducement alleged by Simpson—failing to disclose a known risk to patients prescribed Baycol—did not necessarily have the effect of increasing the amounts paid for reimbursement of claims submitted under the DoD contracts ... To plead this alleged fraud with the particularity Rule 9(b) requires, she needed to allege specific harm resulting from specific false claims submitted under the fraudulently induced DoD contracts."). The allegations in the complaint are insufficient to prove fraud in the inducement and I respectfully recommend that Plaintiffs' motion for entry of default judgment on Count I be **denied**.

### 2. Breach of Agreement

Count II states a claim for breach of the Agreement by both Defendants (Doc. 4, ¶¶ 92-96).To make a claim for breach of contract under Florida law a plaintiff must show "(1) a valid contract, (2) a material breach, and (3) damages." Havens v. Coast Florida, P.A., 117 So. 3d 1179, 1181 (Fla. 2d DCA 2013); see Limu Co., LLC v. Burling, No. 6:12-cv-

347-Orl-TBS, 2013 WL 3462327, at *5 (M.D. Fla. July 9, 2013) (citing Vega v. T-Mobile USA, Inc. 564 F.3d 1256, 1272 (11th Cir. 2009)).

Plaintiffs have alleged that they entered into the Agreement with Defendants; that Defendants failed to pay Plaintiffs anything, let alone the guaranteed amount by the deadline established in the Agreement; and Plaintiffs were damaged because they have not received the return of their investment or profits (Doc. 1, ¶¶ 53-54, 57, 66, 81-83). These allegations are sufficient to sustain a cause of action for breach of the Agreement.

### 3. Violation of Section 10(b) of the 1934 Act and Rule 10b-5

In Count III Plaintiffs allege that Defendants[6] violated Section 10(b) of the 1934 Act,15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5 (Doc. 21 at 5-6). To sustain a claim under § 10(b) and Rule 10b-5, a plaintiff must allege:

> (1) a material misrepresentation or omission; (2) made with
> scienter; (3) a connection with the purchase or sale of a
> security;[7] (4) reliance on the misstatement or omission; (5)

---

[6] In the motion for default, Plaintiffs state that their 10(b)(5) cause of action is only against AMT (Doc. 21 at 5), but this is not borne out by the complaint. There, Plaintiffs direct their allegations to both, AMT *and* Keesee" "Defendant**s** failed to disclose material facts ... Defendant**s**' misrepresentations were material because ... Defendant**s** acted with scienter ... Plaintiffs relied on Defendant**s**' misrepresentations (Id., ¶¶ 97-104) (emphasis added).

[7] Under the statute, "security" is defined as:

> [A]ny note, stock, treasury stock, security future, security-based swap,
> bond, debenture, certificate of interest or **participation in any profit-sharing
> agreement** or in any oil, gas, or other mineral royalty or lease, any
> collateral-trust certificate, preorganization certificate or subscription,
> transferable share, investment contract, voting-trust certificate, certificate
> of deposit for a security, any put, call, straddle, option, or privilege on any
> security, certificate of deposit, or group or index of securities (including any
> interest therein or based on the value thereof), or any put, call, straddle,
> option, or privilege entered into on a national securities exchange relating
> to foreign currency, or in general, any instrument commonly known as a
> "security"; or any certificate of interest or participation in, temporary or
> interim certificate for, receipt for, or warrant or right to subscribe to or
> purchase, any of the foregoing; but shall not include currency or any note,
> draft, bill of exchange, or banker's acceptance which has a maturity at the
> time of issuance of not exceeding nine months, exclusive of days of grace,
> or any renewal thereof the maturity of which is likewise limited.

> economic loss [i.e., damages]; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called "loss causation."

FindWhat Investor Group v. FindWhat.com, 658 F.3d 1282, 1295 (11th Cir. 2011)

(quoting Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1236 (11th Cir. 2008)).

Title 15 U.S.C. § 78u-4(b)(1) "requires that a complaint involving securities fraud actions, as here, shall specify: 'each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.' In addition, 15 U.S.C. § 78u-4(b)(2) provides that the complaint 'shall, with respect to each act of omission alleged[,] … state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Feeney v. Mego Mortg. Corp., No. 1:98-cv-0593-CAM, 45 F. Supp. 2d 1356, 1357 (N.D. Ga., Apr. 8, 1999). Plaintiff's complaint fails to identify the allegations of fact which supposedly give rise to a strong presumption that each specific alleged misrepresentation or omission was made with the intent to commit fraud.

Under the Private Securities Litigation reform Act ("PSLRA"), a plaintiff must satisfy the heightened pleading standard for Rule 10b-5 claims and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." In re Pegasus Wireless Corp. Securies Litig., 657 F. Supp. 2d 1320, 1324-1325 (S.D. Fla. 2009) (citing 15 U.S.C. § 78u-4(b)). "To satisfy the [PSLRA], some basis must be provided for each belief by the Plaintiffs that the Defendants' statements were false." In re Theragenics Corp., Securities Litigation, No. Civ.A. 1:99CV141TWT, 105 F.Supp.2d

---

15 U.S.C. § 78(c)(10).

1342, 1356 (N.D. Ga. July 20, 2000). "[U]nder the PSLRA, plaintiffs are required to specify each statement alleged to have been misleading, and the reasons why the statement is misleading." Id. (quoting In re Health Mgmt. Sys., Inc. Sec. Litig., 1998 WL 283286, at * 3(S.D.N.Y. June 1, 1998).

Plaintiffs allege that AMT and Keesee (on behalf of AMT) "made numerous misrepresentations of material fact to Plaintiffs regarding the profits Plaintiffs would be paid if they invested in AMT." (Doc. 4, ¶ 99). Plaintiffs further allege that these misrepresentations were material because they would not have invested with AMT "1.) if they had known the risks associated with their investment in AMT and with the international gold industry, in general; and 2) if they would not receive any profit from their investment in fifty (50) days (or ever), as represented by Keesee, individually and on behalf of AMT." (Id., ¶ 101). Plaintiffs allege that under the terms of the Agreement they were to share profits with AMT (Doc. 4, ¶ 53; Doc. 4-3 at 1).

Plaintiffs have alleged that Defendants knew they would be willing to invest because of a prior dealing (Id., ¶ 102), and that Defendants "intended to deceive and manipulate Plaintiffs into giving them the funds for AMT to purchase unrefined gold so that Defendants could purchase and sell gold and retain one hundred (100%) percent of the profit for themselves." (Id., ¶ 101). These averments are conclusory, and Plaintiffs have not stated with particularity any facts showing scienter on the part of either Defendant. See Mizzaro, 544 F.3d at 1238. Also, as explained in section II.C.1, supra, The complaint is insufficient to satisfy Plaintiffs' burden with respect to averments made "on information and belief." And, Plaintiffs have failed to show that their injuries are a direct result of Keesee's failure to disclose the risks associated with the investment. Therefore, I find that Plaintiffs' complaint does not state a cause of action for a 10(b)(5)

violation and respectfully recommend that the district judge **deny** the motion for default

judgment on Count III.

### 4.   Violation of Section 20 of the 1934 Act

Count IV is a claim against Keesee for controlling person liability under the 1934

Act (Doc. 4, ¶¶ 110-122). The law imposes derivative liability on individuals who control

the actions of a primary violator of the Act:

> Every person who, directly or indirectly, controls any person
> liable under any provision of this chapter or of any rule or
> regulation thereunder shall also be liable jointly and severally
> with and to the same extent as such controlled person to any
> person to whom such controlled person is liable (including to
> the Commission in any action brought under paragraph (1) or
> (3) of section 78u(d) of this title), unless the controlling person
> acted in good faith and did not directly or indirectly induce the
> act or acts constituting the violation or cause of action.

15 U.S.C.A. § 78t; see also Mizzaro v. Home Depot, 544 F3d 1230, 1236, 1237 (11th Cir.

2008). Under the statute, a cause of action may be brought against an individual for

violations of securities laws by a corporate entity. Mizzaro, 544 F. 3d at 1237 ("To state a

claim under § 20(a), Bucks County must allege three elements: (1) that Home Depot, Inc.

committed a primary violation of the securities laws; (2) that the individual defendants had

the power to control the general business affairs of Home Depot; and (3) that the

individual defendants "had the requisite power to directly or indirectly control or influence

the specific corporate policy which resulted in primary liability."). In the Eleventh "[C]ircuit,

a defendant is liable as a controlling person under section 20(a) if he or she "had the

power to control the general affairs of the entity primarily liable at the time the entity

violated the securities laws ... [and] had the requisite power to directly or indirectly control

or influence the specific corporate policy which resulted in the primary liability." Brown v.

Enstar Grp., Inc., 84 F.3d 393, 396 (11th Cir. 1996) (citing Brown v. Mendel, 864 F. Supp. 1138, 1145 (M.D. Ala 1994)); Rosenberg V. Gould, 554 F.3d 962, 967 (11th Cir. 2009).

Section 20(a) liability is related to 10(b)(5) liability insofar that derivative liability necessarily fails if a plaintiff is unable to prove the underlying cause of action. Mizzaro, 544 F.3d at 1255 ("Because Bucks County failed to adequately plead a violation of § 10(b) and Rule 10b-5 by Home Depot, Inc., its § 20(a) control-person claims against the individual defendants necessarily fails as well.") (citing Garfield v. NDC Health Corp., 466 F.3d 1255, 1261 (11th Cir. 2006)); see also Kadel v. Flood, 427 F. App'x 778, 780 (11th Cir. 2011) ("[A]s the parties concede, appellants' section 20(a) claim cannot stand unless the Complaint states a claim for relief under section 10(b)."); Carvelli v. Ocwen Fin. Corp., Case No. 9:17-cv-80500-RLR, 2010 U.S. Dist. LEXIS 73597, at *8 (S.D. Fla. April 27, 2018) ("If a plaintiff fails to plead adequately a violation of Section 10(b) and Rule 10b-5, a claim under Section 20(a) necessarily fails as well.").

As explained in section II.C.3.supra, Plaintiffs' allegations, do not support a claim under 10(b)(5). Consequently, Plaintiffs' section 20(a) claim necessarily fails and I respectfully recommend the district judge **deny** the motion for default judgment on Count IV.

#### 5.  *Violation of the Florida Securities and Investor Protection Act*

Count V is an action for violation of the antifraud provision of the Florida Securities and Investor Protection Act ("FSIPA"), FLA. STAT. § 517.301. The statute makes it unlawful for a person:

> (a) In connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of s. 517.051 and including any security sold in

> a transaction exempted under the provisions of s. 517.061, directly or indirectly:
>
>> 1. To employ any device, scheme, or artifice to defraud;
>>
>> 2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
>>
>> 3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

FLA. STAT. § 517.301(a)(1)-(3). To sustain a cause of action the plaintiff must show: "(1) a material misrepresentation, (2) made with scienter or reckless disregard as to the truth of the communication, (3) that was justifiably relied upon, (4) in connection with a purchase or sale of securities; and (5) that the misrepresentation was the direct proximate cause of the loss." Barnett v. Blane, No. 11-14345-CIV, 2013 WL 1001963, at *2-3 (S.D. Fla. Mar. 13, 2013) (citing Compania de Elaborados de Cafe v. Cardinal Capital Mgmt., Inc., 401 F.Supp.2d 1270, 1280 (S.D .Fla.2003)); see also Durden v. Citicorp Trust Bank, FSB, 2009 WL 6499365, at *5 (M.D. Fla. 2009). Remedies are provided in § 517.211 of the statute. Id. (citing FLA. STAT. § 517.211).

FSIPA claims must be plead with the specificity required by Rule 9, except that scienter may be pled by showing negligence. Liva v. Mendolia, No. 9:13-cv-81047-KAM, 2014 WL 2118814, at *3 (S.D. Fla. May 21, 2014) ("The elements of a cause of action under § 517.301 [of FSIPA] are identical to those under the Federal Rule 10b-5, except that the scienter requirement under Florida law is satisfied by showing of mere negligence.") (citing Grippo v. Perazzo, 357 F.3d 1218, 1222 (11th Cir.2004)). Plaintiffs allege that Defendants intended to deceive and manipulate them into investing $150,000

into AMT to purchase unrefined gold so that Defendants could purchase and sell the gold and keep the profits for themselves (Doc. 4, ¶ 101). As explained in section II.C.3, This allegation is conclusory. Plaintiffs have not identified the particular facts that they believe support an allegation of scienter or negligence on the part of either Defendant. See Mizzaro, 544 F.3d at 1238. Therefore, I respectfully recommend the district judge **deny** the motion for default judgment on Count V.

> 6. *Unjust Enrichment*

Plaintiffs bring Count VI as an alternative cause of action against AMT for unjust enrichment (Doc. 4, ¶¶ 131-136). To state a cause of action for unjust enrichment, a plaintiff must show (1) that he conferred a benefit upon the defendant; (2) that defendant acknowledges, voluntarily accepts, and retains the benefit; and (3) that "the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff." Nationwide Mut. Co. v. Ft. Myers Total Rehab Cntr., 657 F. Supp. 2d 1279, 1290 (M.D. Fla. 2009) (citing Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp, 899 So 2d 1222, 1227 (Fla. 1st DCA 2005)); see also Butler, Inc. v. Trizec Prop., Inc., 524 So.2d 710, 712 (Fla. 2d DCA 1988).

Plaintiffs allege that they invested $150,000 with Defendants based on Keesee's representations about his ability to multiply the investment by purchasing and selling gold but that he failed to pay Plaintiffs any portion of the resulting profits (Doc. 4, ¶¶ 46, 49, 53-54, 57, 66). These averments are sufficient to sustain a claim for unjust enrichment. However, because default judgment is properly entered on Plaintiffs' claim for breach of the Agreement, the motion to enter default judgment on the alternative unjust enrichment theory should be denied. See Huddleston v. Smith, Civil Action No. 1:09-cv-03669-JOF, 2010 WL 1410556, at *2, n.1 (N.D. Ga. Mar. 30, 2010) ("Because the court grants default

judgment as to the breach of contract claim, the court need not consider Plaintiff's alternative unjust enrichment claim."); Continental Cas. Co. v. Trucks, Inc., CIVIL ACTION NO. 5:11-cv-307 (CAR). 2011 WL 5325537, at *2, n. 2 (M.D. Ga. Nov. 3, 2011) ("Because the Court grants default judgment as to the breach of contract claims, the Court does not need to consider Plaintiffs' alternative unjust enrichment and account stated claims.").

### 7.  Action for Breach of Note

Count VII is a claim against Defendants for breach of the Note. To prevail on this claim Plaintiffs must establish the same elements as required for a breach of contract claim: "(1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." Whitney Bank v. Davis-Jeffries-Hunold, Inc., Civil Action No. 12-0076-KD-C, 2012 WL 2808301, at *7 (S.D. Ala. July 10, 2012).

The complaint alleges that Defendants executed and delivered the Note to Plaintiffs, and that they failed to pay the Note at maturity (Doc. 1, ¶¶ 69, 138; Doc. 4-5, ¶ 2). Now, Plaintiffs allege they are owed the $150,000 principal amount of the Note plus interest at the rate of 5% per annum, together with attorney's fees and costs (Id., ¶ 140). Plaintiffs have stated a cause of action and I respectfully recommend their motion for default judgment be **granted** as to Count VII.

### D.  Damages

Because Defendants are liable for breach of the Agreement and Note the Court must ascertain the amount of damages. See Adolph Coors Co., 777 F.2d at 1543-44. Generally, in a breach of contract action, a prevailing plaintiff's damages are measured as the reasonable amount of lost profits, which are ascertainable, that would have resulted

had there been no breach and had the contract been performed." <u>Neva, Inc. v. Christian Duplications Int'l, Inc.</u>, 743 F. Supp. 1533, 1550 (M.D. Fla. 1990). "Damages may be awarded only if the record adequately reflects the basis for the award via a hearing or a demonstration of detailed affidavits establishing the necessary facts." <u>See</u> <u>id.</u> at 1544 (quoting <u>United Artists Corp.</u>, 605 F.2d 854). Plaintiffs allege "[u]pon information and belief, AMT has earned significant profits from its purchase and sale of gold in Africa and continues to utilize the profits derived from Plaintiffs' Investment Account (as well as Plaintiffs' names and passport information) to continue buying and selling gold without paying Plaintiffs any profits derived from their Investment Account." (Doc. 4, ¶ 82). As this Court observed when it adopted a report and recommendation in another case:

> While Defendants are held to admit the 'well pled' allegations, the instant Complaint is riddled with conclusory assertions – twenty seven in total – which are based on nothing more than "information and belief." The Complaint asserts that "Defendants" are "believed to be the registrants of the domain names www.phazzer-usa.com and www.protective-solutions.com," although these domains are alleged to be registered through a third party. The Complaint alleges that these Defendants are believed to be marketing PHAZZER and non-phazzer products under these domain names, but neither the Complaint nor the supporting materials set forth a factual basis for that belief. While there is nothing wrong with alleging factual averments conditionally, <em>see</em> Rule 11(b)(3), Fed. R. Civ. P. (2015), a default does not transform such conditional statements of belief into established facts. "Conclusory allegations made upon information and belief are not entitled to a presumption of truth, and allegations stated upon information and belief that do not contain any factual support fail to meet the <u>Twombly</u> standard." In re Superior Air Parts, Inc., 486 B.R. 728, 741 (Bankr. N.D. Tex. 2012) <em>aff'd sub nom.</em> <u>Lycoming Engines v. Superior Air Parts, Inc.</u>, 3:13-CV-1162-L, 2014 WL 1976757 (ND. Tex. 2014 (internal citations omitted).

<u>Phazzer Electronics, Inc. v. Protective Solutions, Inc.</u>, No. 6:15-cv-348-Orl-31DAB, 2015 WL 7076847, at *1 (M.D. Fla. Nov. 13, 2015), adopting report and recommendation

2015 WL 7184561 (M.D. Fla. Oct. 27, 2015). Plaintiffs allege that they purchased a security in AMT. That investment could increase or decrease in value. What actually happened is not known. Plaintiffs' averments "on information and belief," for which there is no factual support other than the Agreement, are, in my view, insufficient to establish that they are now owed $3,000,000.

In addition, the amount of damages should be objectively reasonable. The expectation of a $3,000,000 return on an investment of $150,000 in fifty days with no risk is unreasonable. I do not find a legitimate basis for Plaintiffs' expectation of a damage award that amounts to an almost 2000% return on their investment in a period of less than two months. The Court could award $100,000 to Gonzalez and $50,000 to Horta, with interest, as restitution for the amounts they invested in AMT but, I do not recommend this.

It is apparent from the amount and timing of the Note that it was intended to repay Plaintiffs' $150,000 investment. In addition to principal and interest, the Note provides for the recovery of Plaintiffs' attorney's fees and costs to enforce the obligation (Doc. 4-5, ¶ 9). Therefore, judgment on the Note is more advantageous to Plaintiffs. Now, I respectfully recommend that the district court award Plaintiffs damages in the amount of $150,000 as principal, together with interest at the rate of 5% per annum for period May 24, 2018 through the date the judgment is entered, plus attorney's fees and costs in an amount to be determined. Attorney's fees should be limited solely to the attorney time expended to prosecute the claim on the Note. If the Court adopts this Report and Recommendation then Plaintiffs should be allowed **fourteen (14)** days to make their application for fees and costs.

## III. Recommendation

Upon consideration of the foregoing, I **respectfully recommend** that the district judge,

(1) **GRANT** Plaintiffs' Motion for Entry of Default Judgment (Doc. 21) on Count VII and otherwise **DENY** the motion.

(2) If the Court adopts this Report and Recommendation, then give **Plaintiffs 14 days** to make application for an award of attorney's fees and costs solely on Count VII of their complaint.

(3) Once the issue of attorney's fees and costs is resolved, that the Clerk be **DIRECTED** to **ENTER JUDGMENT** for Plaintiffs and against Defendants, jointly and severally damages in the amount of $150,000 with interest and any fees and costs taxed.

## IV. Notice to Parties

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. See 11th Cir. R. 3-1.

**RECOMMENDED** in Orlando, Florida on December 13, 2018.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

Presiding District Court Judge
Counsel of Record
Any Unrepresented Parties