UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOSE LUIS GONZALEZ and GERARDO
HORTA OCANA,

      Plaintiffs,

v.                                     Case No:   6:18-cv-1294-Orl-31TBS

AGAVE METAL TRADING LLC and
MANUEL A. KEESEE,

      Defendants.

_____

## REPORT AND RECOMMENDATION

This case comes before the Court without a hearing on Plaintiffs' Motion for Attorneys' Fees and Costs (Doc. 31). Defendants have failed to respond to the motion and the time within to do so has expired. "When a party fails to respond, that is an inclination that the motion is unopposed." Foster v. Coca-Cola Co., No. 6:14-cv-2102-Orl-40TBS, 2015 WL 3486008, at *1 (M.D. Fla. June 2, 2015) (citing Jones v. Bank of America, N.A., 564 F. App'x 432, 434 (11th Cir. 2014)); Strykul v. PRG Parking Orlando, L.L.C., Case No. 6:14-cv-211-Orl-31GJK, 2015 WL 789199, at *2 (M.D. Fla. Feb. 24, 2015). Based upon Defendants' failure to respond, I proceed on the basis that Defendants do not oppose the requested relief. For the reasons discussed below, I respectfully recommend that the motion be **granted in part**.

## Background

Plaintiff Jose Luis Gonzalez and non-party James Pomeroy were directors of Ma Niel UK Limited ("Maniel UK") (Doc. 4, ¶ 10). Defendant Manuel A. Keesee is the vice president, secretary, treasurer and managing director of non-party Power Network Group,

Inc. ("PNG") (Id., ¶ 13). PNG developed a municipal solid waste gasification power generation system (Id., ¶ 15). In 2017, Maniel UK agreed to underwrite up to $1,300,000 for the development and construction of waste-to-energy plants in the United States and other countries in exchange for PNG's payment of a $50,000 retention fee and a $1,500,000 commitment fee (Id., ¶ 16). Instead of paying the fees, PNG issued a stock certificate to Maniel UK for 500,000 shares of its common stock (Id., ¶ 17).

PNG contracted to buy a building ("Building") in Tampa, Florida from the Bina Kumar Irrevocable Trust ("Kumar") for $9,000,000 (Id., ¶¶ 18-19). As part of this transaction, PNG agreed to give Kumar a $1,000,000 standby letter of credit (Id., ¶¶ 20-21). Despite this agreement, a different entity, Ma Niel Group Mexico Sapi de CV ("Maniel Mexico") delivered its $1,000,000 letter of credit to Kumar (Id., ¶¶ 22-23). Maniel Mexico and Maniel UK are both subsidiaries of Maniel Group S.A. (Id., ¶ 12). Gonzalez and his co-Plaintiff Gerardo Horta Ocana were directors of Maniel Mexico (Id., ¶ 11).

In 2018, Pomeroy decided to sever all ties between Maniel UK, PNG and Keesee (Id., ¶ 24). Keesee also wanted to sever all ties between himself, PNG and Maniel UK (Id., ¶ 25). On March 14, 2018, Keesee sent a letter purporting to rescind Maniel UK's shares in PNG (Id.). The letter, a copy of which was sent to Kumar, said PNG would buy the Building without Maniel UK (Id., ¶¶ 25-26). Upon learning of this letter, Maniel Mexico sought to revoke the $1,000,000 letter of credit (Id., ¶ 27). Since Maniel Mexico took this action Kumar has unsuccessfully attempted to negotiate the letter of credit (Id., ¶ 28).

In May 2018, Keesee informed Maniel Mexico that in June, PNG would make a $1,000,000 deposit to buy Maniel Mexico's interest in the contract for the Building (Id., ¶ 29). In return, PNG asked Maniel Mexico to tell Kumar the letter of credit would not be honored except on instruction from Keesee (Id., ¶ 30). Maniel Mexico agreed to these

terms (Id., ¶ 31). PNG failed to pay the $1,000,000 and Kumar has threatened legal action in response to the revocation of the letter of credit (Id., ¶¶ 33-34). Still, Gonzalez continued his business relationship with Keesee in hopes of salvaging the Building deal and eliminating Maniel Mexico's liability on the letter of credit (Id., ¶ 35).

Keesee is also the controlling person and president of Defendant Agave Metal Trading LLC ("AMT") which is in the business of buying and selling gold (Id., ¶¶ 36, 111). Keesee told Plaintiffs he had been buying and selling gold for over twenty years and that he had all the required licenses and authorizations to purchase and sell gold internationally (Id., ¶ 49).

Beginning in March 2018 Keesee informed Gonzalez that Keesee would soon be traveling to Kenya on behalf of AMT to buy unrefined gold, which AMT would bring to the United States where it would be refined, and then transported back to Africa for sale at a significant profit (Id., ¶ 37). Keesee offered Gonzalez the opportunity to invest in this venture (Id.). He also gave Gonzalez correspondence with AMT's gold supplier, evidence of AMT's compliance with international laws regarding the purchase and sale of gold, and his travel visas (Id., ¶ 39). Gonzalez said he and Horta might be interested (Id., ¶ 38).

Keesee proposed that Plaintiffs invest $1,500,000 in this venture (Id., ¶ 40). When they declined, Keesee told Plaintiffs they could invest a minimum of $150,000 so as not to miss out on this excellent investment opportunity (Id., ¶ 41). Keesee also gave Gonzalez a spreadsheet showing that Plaintiffs' $150,000 investment would return a $4,000,000 profit (Id., ¶ 42). At a subsequent meeting, Keesee guaranteed Plaintiffs that if they invested $150,000 it would generate a profit of $550,000 of which $450,000 would be reinvested and used by AMT to purchase additional unrefined gold

that would, in 50 days, result in a $4,000,000 profit for Plaintiffs and AMT (Id., ¶ 46). When Keesee made these representations, he did not disclose any risks associated with Plaintiffs' proposed investment in AMT (Id., ¶ 51).

In April 2018, Plaintiffs entered into an Investment Agreement with AMT (the "Agreement") (Id., ¶ 52). The Agreement provides for the payment of $100,000 by Gonzalez and $50,000 by Horta to AMT (Id., ¶ 53). It further provides that AMT will acquire unrefined gold for a profit of $4,000,000 over a 50 day period to be shared by Plaintiffs and AMT (Id., ¶ 53). From the profits, Gonzalez is supposed to receive $2,000,000, and Horta is supposed to receive $1,000,000 (Id., ¶ 54). The Agreement does not disclose any risks associated with Plaintiffs' investment with AMT (Id., ¶ 55). Plaintiffs paid AMT the $150,000 on or about April 3, 2018 (Id., ¶ 56).

Plaintiffs allege, on information and belief, that Keesee traveled to Kenya on or about April 3, 2018 to engage in business on behalf of AMT (Id., ¶ 58). Within the first week of Keesee's arrival in Kenya he sent videos and photographs to Gonzalez depicting 50 kilograms of unrefined gold Keesee had purportedly purchased with Plaintiffs' investment funds (Id., ¶ 59). The videos and photographs also showed Keesee in Kenya with cases of large gold bars, cases of small gold nuggets, and Keesee holding bars of gold (Id.).

Approximately two weeks into his trip to Kenya, Keesee told Gonzalez everything was going well and that he would be traveling to Dubai the following Monday instead of returning to the United States, to refine 100 kilograms of gold; that he would obtain an additional 200 kilograms of unrefined gold; and then return to the United States in time to finalize the transaction and pay Plaintiffs prior to the deadline in the Agreement (Id., ¶ 60).

On or about May 7, 2018, Keesee sent Gonzalez an email stating that a second purchase of gold would be leaving Kenya that night to be refined in Dubai (Id., ¶61). Keesee also sent Gonzalez import and export documents dated May 7, 2018 and a shipping tracking record from Emirates SkyCargo, purportedly showing that the gold would be shipped from Kenya to Dubai on May 8, 2018 (Id.).

About May 14, 2018, Keesee sent Gonzalez an email advising that the authorities had confiscated 4.33 kilograms of gold that had already been boarded on a plane; that Keesee had two packages being held in customs in Kenya; and that there would be a court hearing the following day to determine that the gold was not stolen and could be exported to Dubai (Id., ¶ 65).

AMT failed to pay Plaintiffs the guaranteed profits on their investment as required by the Agreement (Id., ¶ 66). Around May 23, 2018, Keesee sent Gonzalez a proposed Addendum to the Agreement, signed by Keesee, which provided for an extension of time for AMT to pay Plaintiffs their share of the profits from their investment (Id., ¶ 67). Plaintiffs did not agree to and did not sign the Addendum (Id., ¶ 68).

On or about May 24, 2018, Keesee executed and delivered to Plaintiffs a Promissory Note (the "Note") in the principal amount of $150,000, bearing interest at the rate of 5% per annum, with a maturity date of June 15, 2018 (Id., ¶ 69).

In June 2018, Keesee asked Gonzalez to immediately send him $6,000 to pay airplane expenses required for the unrefined gold to be shipped from Kenya to Dubai (Id., ¶ 70). Plaintiffs, fearing that if they did not comply, they would lose their entire investment, immediately wired $6,000 to AMT's bank account (Id.).

On June 19, 2018, Keesee sent Gonzalez an email stating that he was in Dubai for the last trip that would allow sufficient gold refinement for him to return to the United States and pay Plaintiffs their profits (Id., ¶ 71). Keesee said this delay was caused in part by problems he had encountered with the United Nations, which required a shipment of 32 kilograms of gold to be returned to Kenya until AMT paid a fine, which was ultimately paid by AMT's attorney in Kenya (Id.). Keesee also told Gonzalez that AMT would earn a profit of only $500,000, which would be deposited directly into AMT's American Chase bank account, from which Keesee would transfer to Plaintiffs their share of the profits (Id., ¶ 72).

On June 25, 2018, Keesee sent Gonzalez an email stating that the sale of the refined gold had been completed; that the sales proceeds had been deposited into AMT's bank account; that a large check would be deposited the following day; and that Keesee planned to leave Dubai on June 26, 2018 (Id., ¶ 73).

On July 7, 2018, Keesee still had not left Dubai; he told Gonzalez he was waiting on payment from the gold purchaser; and that AMT would be responsible for paying a five percent (5%) tax since the company was not registered to do business in the United Emirates (Id., ¶ 74). This was contrary to Keesee's prior representations that AMT had all the requisite licenses and authorizations to conduct business in Africa (Id.).

From July 4, 2018 through July 12, 2018, Keesee sent several emails to Gonzalez stating that while in Dubai, a gold purchaser had deposited $234,742.76 into AMT's bank account, from which Plaintiffs would receive $150,000, but that due to numerous problems with the bank Keesee could not transfer the funds to Plaintiffs (Id., ¶ 75). Keesee said he would transfer the money to Plaintiffs immediately once the funds cleared AMT's bank account (Id.).

All communications between Keesee and Gonzalez ceased as of July 23, 2018 and Plaintiffs never received payment from AMT or Keesee (Id., ¶ 79). They filed this lawsuit against AMT and Keesee alleging fraud; breach of the Agreement; violations of sections 10(b) and 20 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5 ("Rule 10b-5"); FLA. STAT. § 517.301; unjust enrichment; and on the Note (Doc. 1).

Plaintiffs served AMT and Keesee on September 11, 2018 (Docs. 13-14). Keesee made a *pro se* motion to on behalf of himself and AMT, requesting an extension of time to respond to the complaint (Doc. 16). The Court denied the motion because Keesee failed to confer with Plaintiffs' counsel in violation of Local Rule 3.01(g), and because AMT can only appear and be heard through an attorney who is a member of the bar of this Court (Doc. 17). Defendants did not renew the motion or otherwise respond to the complaint and the Clerk granted Plaintiffs' motions for entry of default against both (Docs. 19-20).

Plaintiffs subsequently moved for the entry of default judgment against AMT and Keesee (Doc. 21). On review, I submitted a Report and Recommendation that the motion be granted only on Count VII which was the claim to enforce the $150,000 Note (Doc. 28). Plaintiffs did not object (Doc. 29), and the Court adopted the Report and Recommendation (Doc. 30). The Note provides for the recovery of Plaintiffs' reasonable attorney's fees and costs (Doc. 4-5, ¶ 9). Now, they seek an award of $8,300.00 in fees and $984.79 in costs (Doc. 31).

### Legal Standard

District courts in the Eleventh Circuit are required to utilize the "lodestar approach" to calculate a reasonable attorney's fee. See Gray v. Bostic, 625 F.3d 692 (11th Cir.

2010); see also City of Burlington v. Dague, 505 U.S. 557, 562 (1992). The lodestar figure is reached by "multiply[ing] the number of hours reasonably expended by a reasonable hourly rate." Loranger v. Stierheim, 10 F.3d 776, 781 (11th Cir. 1994) (internal quotations omitted); see also Jackson v. Grupo Indus. Hotelero, S.A., No. 07-22046, 2010 WL 750301, at *2 (S.D. Fla. Mar. 3, 2010).

The first step in determining the lodestar is to assess the reasonable number of hours expended. Jackson, 2010 WL 750301, at *3-4. The fee applicant bears the burden of documenting the appropriate number of hours. See United States v. Blue Cross & Blue Shield of Fla., Inc., 882 F. Supp. 166, 170 (M.D. Fla. 1995). The second step in determining the lodestar is to assess the reasonableness of the attorney's hourly rate. "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." Loranger, 10 F.3d at 781; see also Jackson, 2010 WL 750301, at *2-3. The following twelve factors, originally set forth in Johnson v. Ga. Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), are also considered in calculating a fee award:

> (1) The time and labor required; (2) [t]he novelty and difficulty of the questions; (3) [t]he skill requisite to perform the legal services properly; (4) [t]he preclusion of other employment by the attorney due to acceptance of the case; (5) [t]he customary fee; (6) [w]hether the fee is fixed or contingent; (7) [t]ime limitations imposed by the client or the circumstances; (8) [t]he amount involved and the results obtained; (9) [t]he experience, reputation, and ability of the attorneys; (10) [t]he 'undesirability' of the case; (11) [t]he nature and length of the professional relationship with the client; and (12) [a]wards in similar cases.

Blue Cross & Blue Shield of Fla., Inc., 882 F. Supp. at 170.

The party seeking attorney's fees bears the burden of producing "satisfactory evidence that the requested rate is in line with prevailing market rates." In most cases,

"satisfactory evidence" consists of something more than the affidavit of the attorney performing the work. Loranger, 10 F.3d at 781. In other cases, district courts have considered the affidavit of the attorney performing the work as the best evidence of the prevailing market rate. See Dillard v. City of Greensboro, 213 F.3d 1347, 1354-55 (11th Cir. 2000) (citing Blum v. Stenson, 465 U.S. 886, 896 (1984))

"Once the Court has determined the lodestar, it may adjust the amount upward or downward based upon a number of factors including the results obtained." Hatfield v. A+Nursetemps, Inc., No, 5:11-cv-416-Oc-10TBS, 2012 WL 2087167, at *1 (M.D. Fla. June 8, 2012), "Ultimately, the computation of a fee award is necessarily an exercise of judgment, because '[t]here is no precise rule or formula for making these determinations.'" Villano v. City of Boynton Beach, 254 F.3d 1302, 1305 (11th Cir. 2001) (quoting Hensley, 461 U.S. at 436). The Court is "an expert on the question [of attorneys' fees] and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value." Norman, 836 F.2d 1292, 1303 (11th Cir. 1988) (quoting Campbell v. Green, 112 F.2d 143, 144 (5th Cir. 1940)).

The attorney fee applicant should present records detailing the amount of work performed. Once the prevailing party produces adequate billing records, the fee opponent "has the burden of pointing out with specificity which hours should be deducted." Rynd v. Nationwide Mut. Fire Ins. Co., No. 8:09-cv-1556-T-27TGW, 2012 U.S. Dist. LEXIS 37973, * 9 (M.D. Fla. Jan. 25, 2012) (quoting Centex-Rooney Const. Co., Inc. V. Martin County, 725 So.2d 1255, 1259 (Fla. App. Ct. 1999)).

### Plaintiffs' Attorney's Fees

Plaintiffs' attorney has submitted timesheets showing a total of 70.60 hours

expended on this case (Doc. 31-2 at 4-6). Plaintiffs reason that since the complaint contains seven causes of action, all of which were addressed in the motion for default, Plaintiffs are entitled to recover 1/7 of the fees incurred (Doc. 31-2, ¶ 8), with the exception of 11.30 hours spent on the motion to seal, objection to the original Report and Recommendation, and issues relating to fraud reporting. Plaintiffs argue that all of this time is recoverable because the hours "would have been incurred regardless of whether Plaintiffs had asserted all seven (7) of the causes of action that are addressed in the Complaint or solely Count VII of the Complaint." (Id., ¶¶ 9-10). By my calculation, this results in a request for reimbursement of 23.6 hours of work consisting of 21.5 hours by attorney Kristen Lake Cardoso and 2.1 hours performed by an unidentified person with the initials "MLA". While I do not agree with Plaintiffs' reasoning, I do find that the 21.5 attorney hours claimed by Ms. Cardoso are reasonable for the work associated with the suit on the Note.

Ms. Cardoso has practiced law for twelve (12) years, is a partner in the law firm of Kopelowitz Ostrow Ferguson Weiselberg Gilbert, and focuses on complex commercial litigation (Doc. 31-2). She is a member of the Florida Bar, the American Bar Association, and the Broward County Bar Association, and she is admitted to the United States District Court for the Southern District of Florida.[1] All we know about "MLA" is that s/he performed services at the rate of $300 per hour (Doc. 31-2 at 6). Although MLA's rate suggests s/he is an attorney, we don't know, nor has any information been provided concerning MLA's qualifications. Consequently, I do not recommend a fee award for MLA's time spent on the case.

---

[1] https://www.kolawyers.com/professionals/kristen-cardoso/

Plaintiffs have offered the affidavit of 37-year veteran attorney, John M. Ross, in support of their argument that the hourly rates charged ($325 per hour for Ms. Cardoso and $300 per hour for MLA) are reasonable (Doc. 31-3). Considering Ms. Cardoso's experience, Mr. Ross' affidavit, and my own knowledge of rates charged in similar cases in this district, I find $325 per hour for Ms. Cardoso's time to be reasonable. Under the lodestar this results in a total of $6,987.50 in attorney's fees (21.5 hours x $325 per hour).

## Plaintiffs' Costs

A prevailing party is generally entitled to an award of all taxable costs incurred in litigating the dispute. See FED. R. CIV. P. 54(d)(1). Rule 54(d)(1) does not, however, "permit 'unrestrained discretion to tax costs to reimburse a winning litigant for every expense he has seen fit to incur in the conduct of his case.'" Scelta v. Delicatessen Support Servs. Inc. et al., 203 F. Supp. 2d 1328, 1339 (M.D. Fla. 2002). Under Rule 54(d)(1) costs are limited to the items enumerated in 28 U.S.C. § 1920:

> A judge or clerk of any court of the United States may tax as costs the following: (1) Fees of the clerk and marshal; (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) Docket fees under section 1923 of this title [28 USCS § 1923]; [and] (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title [28 USCS § 1828].

28 U.S.C. § 1920; see Scelta, 203 F. Supp. 2d at 1339. Plaintiffs seek the following costs:

| | |
|---|---|
| Filing Fee | $400.00 |
| Service of Process | $375.00 |
| Federal Express | $170.50 |
| Postage Recovery | $4.29 |

Total                    $984.79

(Doc. 31-2 ¶ 12). For reasons unknown, Plaintiffs have not filed a Bill of Costs. I find the

filing fee and fee for service of process reasonable. However, the Eleventh Circuit has

held that costs for postage and couriers are not recoverable under § 1920. Gary Brown &

Assocs. v. Ashdon, Inc., 268 F. App'x 837, 846 (11th Cir. 2008). Consequently, I

recommend the Court reject the $174.79 claimed for Federal Express and Postage

Recovery. This results in $775.00 in taxable costs.

## Recommendation

Now, I **Respectfully Recommend** that the motion for fees (Doc. 31) be **GRANTED**

**in part** and that Plaintiffs be awarded $6,987.50 in attorneys' fees and $775.00 in costs. I

**Respectfully Recommend** that the remainder of Plaintiffs' claim for fees and costs be

**DENIED**.

Once the Court has determined the fee and cost award to Plaintiffs, final judgment

should be entered for Plaintiffs and against Defendants, jointly and severally, for the

principal, interest, fees and costs that are due on the Note.

Within fourteen days from the rendition of this Report and Recommendation

Plaintiffs should file an affidavit setting forth the principal and interest due on the Note to

assist the Court.

## Notice to Parties

A party has fourteen days from this date to file written objections to the Report and

Recommendation's factual findings and legal conclusions. A party's failure to file written

objections waives that party's right to challenge on appeal any unobjected-to factual

finding or legal conclusion the district judge adopts from the Report and

Recommendation. See 11th Cir. R. 3-1.

**RESPECTFULLY RECOMMENDED** at Orlando, Florida on February 8, 2019.

_____
THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

      Presiding United States District Judge
      Counsel of Record
      Any Unrepresented Parties